UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:

                Chapter 7

     CHRISTINE PERSAUD,           Case No. 10-44815-ESS

                Debtor.

---------------------------------------------------------------x

### MEMORANDUM DECISION ON TRUSTEE'S APPLICATION TO EMPLOY TROUTMAN SANDERS LLP AS COUNSEL

Appearances:

SAMUEL J. LANDAU
Samuel J. Landau, Esq.
250 West 57th Street
New York, NY 10107
 *Attorneys for the Debtor*

STEPHEN N. PREZIOSI
Stephen N. Preziosi, Esq.
570 Seventh Avenue (6th Floor)
New York, NY 10018
 *Attorneys for the Debtor*

PEREIRA & SINISI, LLP
John S. Pereira, Esq.
405 Lexington Avenue (7th Floor)
New York, NY 10174
 *Attorneys for John S. Pereira,*
 *Chapter 7 Trustee*

TROUTMAN SANDERS LLP
John P. Campo, Esq.
Lee W. Stremba, Esq.
405 Lexington Avenue
New York, NY 10174
 *Attorneys for John S. Pereira,*
 *Chapter 7 Trustee*

MENDEL ZILBERBERG
 & ASSOCIATES, P.C.
Mendel Zilberberg, Esq.
6619 Thirteenth Avenue
Brooklyn, NY 11219
 *Attorneys for Abraham Klein*

KRINSKY, PLLC
Pery D. Krinsky, Esq.
Woolworth Building
233 Broadway (Suite 707)
New York, NY 10279
 *Attorneys for Abraham Klein*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Application of John S. Pereira, the Chapter 7 trustee for the estate of Christine Persaud, to retain Troutman Sanders LLP ("Troutman") as his general and bankruptcy counsel.

One creditor, Abraham Klein, objects in part. Mr. Klein argues principally that as to certain claims, Troutman suffers from a disabling conflict of interest and is not "disinterested" as required by the Bankruptcy Code. He asserts that Troutman represented him and an entity that he owns and controls, Global Realty Ventures ("GRV"), in connection with a possible investment in a real estate venture in China and that, while this representation may presently be "on hold," it is "ongoing." And he states that the Trustee may assert claims against him or GRV that are substantially related to Troutman's prior representation. As to these claims, Mr. Klein argues, Troutman must stand to the side.

Mr. Klein also asserts that the Troutman retention will result in litigation that will diminish the funds available to priority and secured creditors, will not lead to a recovery for unsecured creditors, and otherwise will not benefit the estate. He argues that the proposed retention is an attempt to attack the validity of a pre-petition arbitration award in his favor, which is presently the subject of litigation in New York state court. And Mr. Klein claims that Troutman's disclosures under Bankruptcy Rule 2014 are inadequate and incomplete.

The Trustee's Application and Mr. Klein's objection call for the Court to apply the standards of Bankruptcy Code Section 327 for the retention of professionals and New York's professional conduct rules governing disqualification of counsel. They also require the Court to consider Bankruptcy Rule 2014 and the framework for disclosure by a professional seeking to be retained. And they require the Court to decide these issues in the context of a hotly disputed

bankruptcy case that has already spawned numerous hearings and appeals, against the background of years of contentious litigation in New York state trial and appellate courts and an arbitration forum.

Jurisdiction

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

Background

*Procedural History*

On May 26, 2010, Christine Persaud filed a petition for relief under Chapter 11 of the Bankruptcy Code.  The case was converted to one under Chapter 7 on April 8, 2011, and John Pereira was appointed Chapter 7 Trustee on April 13, 2011.

On August 10, 2011, the Trustee filed this Application to employ Troutman as general and bankruptcy counsel, supported by a declaration pursuant to Bankruptcy Rule 2014 by John Campo, a Troutman partner.  Five days later, Mr. Klein filed an objection to the Application and thereafter, a reply in further opposition.  The Trustee responded with a supplemental declaration of Mr. Campo, a declaration in response to Mr. Klein's objection and a memorandum of law in support of the response, and affirmations of Mr. Campo and Aurora Cassirer of Troutman.

On September 19, 2011, the parties filed a joint pre-hearing statement.  And on September 23, 2011, the Court entered an order, without objection from Mr. Klein, authorizing the Trustee to retain Troutman as general and bankruptcy counsel except as to claims that the Trustee may assert against Mr. Klein or GRV.

Litigation among these parties in this Court has not been limited to the question of the

2

Troutman retention.  On October 31, 2011, the Court entered orders pursuant to Bankruptcy Rule 2004 authorizing the Trustee to conduct examinations of Mr. Klein and other individuals, as well as Caring Home Care, LLC ("Caring"), limited principally to the production of documents concerning business arrangements among the Debtor, Mr. Klein, their related entities, and Caring.  Those orders granted some, but not all, of the relief sought by the Trustee.  Mr. Klein and others sought reconsideration of the Rule 2004 orders, and on November 10, 2011, the Court entered amended orders to clarify the scope of the required document production.  The Court also entered an order on consent directing the Debtor to provide certain contact information to Mr. Klein.

Next, on November 18, 2011, the same day that document production was to commence, Mr. Klein and others sought a stay pending appeal of the Rule 2004 orders in the U.S. District Court for the Eastern District of New York on grounds, among others, that this Court lacks subject matter jurisdiction.  The request for a stay was heard by Hon. Roslynn Mauskopf and denied on that same day.

### The Evidentiary Hearing

The Court held an evidentiary hearing on the Trustee's Application over nine days from September 15, 2011 to November 28, 2011.  The Court heard testimony from Ms. Cassirer and Mr. Campo in support of the Application, and from Mr. Klein and his brother Hershel Klein in opposition.  The Court also received the expert ethics testimony of Professor Bruce Green via affidavit, and thereafter marked the matter submitted.

### Factual Background

Before this bankruptcy case was filed, the Debtor and Mr. Klein conducted certain businesses together, including Caring.  The record shows that in late 2008, Mr. Klein explored the possibility of investing in a real estate venture in China with a partner (the "China Project").  In connection with that project, Mr. Klein or his brother Hershel Klein approached Troutman, which maintains an office in Shanghai, for information and advice.

Over the course of several weeks beginning in late July 2008, Mr. Klein and Hershel Klein exchanged e-mails and had other contacts with Troutman professionals located in Shanghai and New York, including Edward Epstein and Wang Tian in the firm's Shanghai office and Ms. Cassirer in New York.  These communications addressed, among other subjects, due diligence in connection with the possible investment, the use of a local consultant in China, the investment vehicle, and Troutman's role.  In early August 2008, Hershel Klein cautioned Mr. Epstein that it would not be "beneficial to filter all back and forth thru you as it would ring up unnecessary legal fees."  Trial Exh. 25 (e-mail from Hershel Klein to Edward Epstein and Abraham Klein (Aug. 5, 2008 5:25 PM)).

At some point, Mr. Klein determined that GRV would be the investment vehicle, and in late November and again in mid-December 2008, Troutman prepared and forwarded to Mr. Klein an engagement letter reflecting the engagement of the firm by GRV.  Hershel Klein executed the engagement letter on December 29, 2008, on behalf of GRV.  It states in part:

> 3.    Conflict Provisions
> . . .
> For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents ("affiliates"). You have agreed that you will not give us confidential information regarding your affiliates.
> . . .

4

4.    Termination of Engagement
. . . either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable Rules of Professional Conduct.  In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter.

Trial Exh. A (Dec. 9, 2008 engagement letter).

Troutman billed GRV in the amount of $10,573.50, for "Services Rendered" through November 30, 2008, in connection with "Project Juan Cheng" – the China Project – on December 10, 2008, to the attention of Mr. Klein.  Trial Exh. N (Dec. 10, 2008 invoice). Troutman billed GRV in the amount of $6,368.30, for "Services Rendered" through December 31, 2008, in connection with the China Project on January 15, 2009, again to the attention of Mr. Klein.  Trial Exh. N (Jan. 15, 2009 invoice).

In late December 2008 or early January 2009, it became evident that the China Project would be placed on hold.  As Mr. Klein testified, he learned on December 31, 2008 "that the developer . . . put [the China Project] on hold."  11/14/11 Tr. 37:17.  As he also testified, the China Project did not regain momentum after that date.  Since that time, the China Project has been dormant.

During this same period, the business relationship between the Debtor and Mr. Klein soured.  Litigation ensued, and their dispute culminated in an arbitration.  The Debtor did not appear in or defend the arbitration, and on March 31, 2009, the arbitration panel issued an award on default in favor of Mr. Klein.  He brought a proceeding to confirm the award in state court, and on April 17, 2009, the New York Supreme Court, Kings County, entered an order confirming the arbitration award, also on default, upon the Debtor's failure to appear at that day's calendar call.  *See Klein v. Persaud*, 84 A.D.3d 959, 959, 921 N.Y.S.2d 900, 900 (N.Y.

App. Div. 2d Dep't 2011) (reciting procedural history).  Troutman had no role in those proceedings.

The Debtor appealed, arguing that the order confirming the arbitration award should be vacated because she had a reasonable excuse for the default and a potentially meritorious defense to the claims.  On May 10, 2011, the Appellate Division found, among other things, that the Debtor "established the existence of a potentially meritorious defense," vacated the confirmation order, and remitted the matter to the Supreme Court "for a new determination on the issue of whether the arbitration award should be confirmed."  *Klein*, 84 A.D.3d at 960, 921 N.Y.S.2d at 900, 901.  Here too, Troutman had no role in those proceedings.  That matter is stayed pending further action by this Court.[1]

*The Trustee's Application To Employ Troutman*

Following the meeting of creditors pursuant to Bankruptcy Code Section 341(a), the Trustee determined that it was in the best interests of this estate to retain counsel with "the capacity and expertise to provide services in the areas of litigation, corporate, regulatory and tax."  Trustee Appl. ¶ 5, ECF No. 182.  He seeks to retain Troutman to provide those services.

As noted above, the Troutman retention has been approved in large measure without objection, and is contested by Mr. Klein only as to claims that the Trustee may assert against him

---

[1] On November 28, 2011, the Debtor sought relief from the automatic stay to permit the parties to proceed in New York Supreme Court, Kings County, on the issue of confirmation of the arbitration award.  The Trustee opposed that motion on grounds that he, not the Debtor, has standing to seek that relief.  This Court heard the motion on December 16, 2011, and entered an order on December 20, 2011 denying the motion "without prejudice to other applications to permit the determination of these issues in the State Court."  Order Denying Stay Relief, ECF No. 359.

or GRV.  As also noted above, the prospect of such claims has already led to vigorously contested litigation in this Court, the denial of emergency applications for a stay pending appeal by Mr. Klein, Melquisedec Escobar, Philip Gottehrer, Joel Klein and Caring, and at least five interlocutory appeals.

The Application states that Troutman is a "disinterested person" as defined in Bankruptcy Code Section 101(14), and that the firm "does not hold or represent any interest adverse to the Trustee or the Debtor's estate in connection with the matters for which it is being retained," except as set forth in the declaration of Mr. Campo.  Trustee Appl. ¶ 9.

Mr. Campo states that "Troutman has investigated its relationships, if any, with the Debtor, the creditors and any parties in interest to whom Troutman will be adverse in this case." Trustee Appl. Exh. A, Campo Decl. ¶ 5.  He declares that "Troutman does not represent any of the creditors or parties in interest to whom Troutman will be adverse in this case."  Campo Decl. ¶ 5(e).  And Mr. Campo states that "Troutman may, from time to time, represent, or may have represented in the past, clients that may be creditors or adverse parties of the Debtor's estate in matters unrelated to this case."  Campo Decl. ¶ 6.

Mr. Campo also declares that "Troutman does not, has not, and shall not represent any entity other than the Trustee in connection with this case."  Campo Decl. ¶ 7.  And he concludes that after reviewing the currently available information, "no conflict exists in connection with [Troutman's] proposed retention by the Trustee," and further, that he will file a supplemental disclosure should "any additional information come[] to Troutman's attention."  Campo Decl. ¶ 8.

After Mr. Klein objected to Troutman's retention, Mr. Campo submitted a supplemental

declaration pursuant to Bankruptcy Rule 2014.  He states that Troutman represented GRV, but not Mr. Klein, in connection with the China Project, and that inasmuch as Mr. Klein is a creditor in this case in his individual capacity, Troutman has no conflict.  Mr. Campo, who joined Troutman on October 1, 2010, nearly two years after the firm's work on the China Project concluded, also states that Troutman's representation of GRV concluded in December 2008 and that the matter is closed.

In addition, Mr. Campo declares that Troutman's prior representation of GRV does not impair the firm's representation of the Trustee or its ability to be adverse to Mr. Klein.  He states that Troutman's representation of GRV concerned advice in connection with the China Project, was billed by attorneys in the firm's Shanghai office, and was connected to the firm's New York office only for purposes of introduction.  He states that Troutman had a duty of loyalty "only . . . with respect to [GRV] in the matter in which" the firm represented GRV, that the "matter is now closed," and that "Troutman owes no duty of loyalty to [Mr.] Klein."  Campo Supp. Decl. ¶ 7. And Mr. Campo declares that Troutman's representation of GRV was "completely unrelated" to Mr. Klein's disputes with the Debtor and the Debtor's estate.  Campo Supp. Decl. ¶ 8.

Mr. Campo also states that in the course of Troutman's prior representation of GRV in connection with the China Project, the firm did not obtain any confidential information that would bear on this case, and that there is "no conceivable overlap" between the subject matter of the prior GRV representation and the Trustee's investigation of potential claims against Mr. Klein.  Campo Supp. Decl. ¶ 9.

As to Troutman's conflicts check, Mr. Campo states that he first learned that Mr. Klein believed Troutman represented him individually during a conversation with Mendel Zilberberg,

Mr. Klein's counsel, in August 2011, about the Trustee's request for financial information and access to Caring.  In response, Mr. Campo requested a conflicts check using Mr. Klein's name, in both open and closed matters.  This process identified the firm's closed representation of GRV showing Mr. Klein as a GRV director or officer, and did not identify any matters, open or closed, where Mr. Klein was the client.  Mr. Campo confirmed that the GRV matter was closed, and advised the Trustee of his conversation with Mr. Zilberberg and the results of the additional conflicts search.  Mr. Campo and the Trustee concluded that there was no conflict in Troutman representing the Trustee.

Ms. Cassirer states that she is the source of Mr. Campo's information concerning Troutman's prior representation of GRV, and confirms that he provided accurate information to the Court.  She affirms that she never "performed any substantive legal work on the [China Project], never billed any time to the client in connection with the prior representation [of GRV], and never became privy to any confidential information."  Cassirer Aff. ¶ 3.  She also states that she is not aware of "any" information of any nature obtained by Troutman, while representing GRV, that bears on or is relevant to the firm's representation of the Trustee.  Cassirer Aff. ¶ 4.  And she states that even though it is unnecessary, the firm will place an "ethical wall" around Mr. Epstein to insulate him from contact with those persons who represent the Trustee.  *Id.*

In summary, the Trustee argues that in 2008, Troutman represented GRV, an entity controlled by Mr. Klein, but not Mr. Klein individually, that the firm's representation of GRV terminated more than two years ago, and that the subject matter of that representation is not substantially related to this case.  He contends that Mr. Klein's opposition to his retention of Troutman is a litigation tactic, designed to obstruct the Trustee's investigation of potential

claims against Caring and his effort to recover the estate's interest in Caring. And the Trustee notes that Mr. Klein may well take issue with the retention of any law firm with the necessary expertise to investigate and pursue the dispute between the Debtor and Mr. Klein, notwithstanding the fact that the Trustee should be allowed to retain counsel of his choice to assist him in carrying out his fiduciary duties.

*Mr. Klein's Objection*

Mr. Klein opposes the Trustee's retention of Troutman on grounds that the firm is conflicted from asserting a claim against him, and this has emerged as the primary grounds for his objection. He points to his retention of Troutman "with respect to one of the entities that he owns and controls, Global Realty Ventures," as the source of the conflict. Klein Opp. ¶ 12. Mr. Klein describes the representation as one which "may currently be on hold, but . . . is still ongoing." *Id.* And he suggests that based on communications in July 2011 between Mr. Zilberberg and Mr. Campo, Troutman may "have to investigate the very acts of Creditor Klein for which he has retained their services." Klein Opp. ¶ 56.

Mr. Klein also argues that if the Trustee decides not to investigate Caring, other creditors may believe that he was influenced by Troutman's representation of Mr. Klein, and may conclude that the Trustee did not adequately pursue the estate's interests.

And Mr. Klein argues that "considering the totality of the circumstances," the Trustee's retention of Troutman will lead to "protracted litigation that will ultimately not yield any meaningful benefit to the unsecured creditors," and will diminish the distributions to priority and secured creditors. Klein Opp. ¶ 12. He states that as of the date of the objection, there were filed priority claims of nearly $400,000 and secured claims of some $2,190,000. Viewed another

way, he states that these claims include his own secured claim of approximately $1,940,000, and some $650,000 in additional secured and priority claims. In addition, Mr. Klein notes that his unsecured claim of approximately $663,000 plus other unsecured claims of some $57,000 total almost $720,000. Mr. Klein argues that if his claim is treated as secured, the Trustee would need to recover nearly $2.6 million, representing the total of these secured and priority claims, as well as additional amounts sufficient to pay administrative expenses and legal fees, before unsecured creditors would receive a distribution. And he calculates that "[i]n the unlikely event" that the Trustee recovers enough to satisfy both priority and secured creditors, and administrative claims, the benefit to unsecured creditors would still be "less than 8%." Klein Opp. ¶ 35.

Alternatively, Mr. Klein posits that if his claim is deemed unsecured, the Trustee would have to recover approximately $650,000 to pay secured and priority claims, as well as sufficient funds to pay administrative expenses and legal fees, before unsecured creditors would receive a distribution. And he calculates that even if the Trustee recovered that amount, unsecured creditors (excluding himself) "would receive a little over 2% of the distribution." Klein Opp. ¶ 36. In either circumstance, Mr. Klein asserts that the retention of a firm of the size and hourly rates of Troutman is "an improvident use of the estate assets." Klein Opp. ¶¶ 37-38.

And finally, Mr. Klein states that based on the arbitration award, Persaud and the estate do not have an interest in Caring, so that the only reason for the Trustee to retain Troutman would be to improve his ability to overturn the arbitration award.

Mr. Klein acknowledges that "there was limited communication between us and the Troutman Firm" at the outset of the firm's work on the China Project because GRV undertook certain due diligence for the China Project first. Trial Exh. O (Klein Supp. Aff. ¶ 30). Mr. Klein

notes that when he contacted Troutman in 2008, it was not "certain" which entity ultimately would be involved in the China Project, and "it was clear" that "I and/or family members were the beneficial client of this representation." Trial Exh. O (Klein Supp. Aff. ¶ 9). He states that "the Troutman Firm was still retained and I was still a client of the [Troutman] Firm." Trial Exh. O (Klein Supp. Aff. ¶ 27).

Mr. Klein argues that at this early stage in the China Project, Troutman's New York and Shanghai offices both had roles in the firm's work. He cites an introductory telephone call on July 30, 2008, among himself, Ms. Cassirer, and Mr. Epstein of Troutman's Shanghai office, in which Ms. Cassirer described to Mr. Epstein the "basic contours of the deal" and his specific needs from the Shanghai office. Trial Exh. O (Klein Supp. Aff. ¶ 18.) He also points to Ms. Cassirer's acknowledgment of a suggestion by Hershel Klein, endorsed by Mr. Klein, that Knight Frank, a consulting firm, complete its work before Troutman performed legal services. And Mr. Klein states, "I was Ms. Cassirer's client." Trial Exh. O (Klein Supp. Aff. ¶ 28).

Mr. Klein also asserts that Troutman's representation is ongoing. As evidence of this, he points to the "the Retainer Agreement signed by the client" on December 29, 2008, and states that if Troutman was closing the matter at that time, and securing the signed agreement was a housekeeping matter before the file was closed, he would have expected an explanatory letter to that effect. Trial Exh. O (Klein Supp. Aff. ¶ 39).

Mr. Klein states that he "furnished the Troutman firm with confidential and secret information with respect to the development opportunity, and through various emails and telephone calls sensitive financial information was disclosed to the Troutman Firm." Trial Exh. O (Klein Supp. Aff. ¶ 19). He disputes Mr. Campo's statement that the firm did not learn

confidential information that bears on this case during the course of the prior representation. And Mr. Klein argues that if Mr. Campo did not gain such information, they would be unable to opine that the two representations are unrelated.

As to the existence of a substantial relationship between the China Project and this bankruptcy case, Mr. Klein argues that the Debtor claims in a sworn affidavit dated April 21, 2009, submitted to New York Supreme Court, Kings County, in the action to confirm the arbitration award, that he improperly transferred funds from Caring to Trade Fame Group Ltd ("Trade Fame"), "an offshore entity related to [his] dealings in China." Trial Exh. O (Klein Supp. Aff. ¶ 51). Mr. Klein concludes that "GRV and Caring are inter-related matters both from the perspective of the Debtor and by virtue of the fact that there was a contemplated deal between both entities" that also involved Trade Fame. Trial Exh. O (Klein Supp. Aff. ¶ 49). For this reason too, Mr. Klein contends that Troutman is conflicted from representing the Trustee in his investigation of transfers from Caring to Trade Fame.

Discussion

This Application requires the Court to consider the legal standards that govern disinterestedness under Bankruptcy Code Section 327. Mr. Klein's objection also implicates the legal standard for disqualification under New York's professional conduct rules, as applied by courts in this Circuit. And the application calls for this Court to assess the adequacy of the Trustee's disclosures under Bankruptcy Rule 2014. Each of these is considered below in turn.

*The Standards Governing Disinterestedness*

Bankruptcy Code Section 327 provides that a trustee "may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested

persons . . . . " 11 U.S.C. § 327(a). And Bankruptcy Code Section 101 defines a "disinterested person" as someone who "does not have an interest materially adverse to the interest of the estate . . . . " 11 U.S.C. § 101(14)(C). While the Bankruptcy Code mandates that an attorney for the estate be disinterested, it does not define what it means to "hold" or "represent an interest adverse to the interest of the estate."

In *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610 (2d Cir. 1999), the Second Circuit observed that "counsel will be disqualified under section 327(a) only if it presently 'holds or represents an interest adverse to the estate,' notwithstanding any interests it may have held or represented in the past." *AroChem*, 176 F.3d at 623. Following several other courts, the Second Circuit adopted the definition of disinterestedness articulated by the court in *In re Roberts*, 46 B.R. 815 (Bankr. D. Utah 1985), *aff'd in relevant part and rev'd and remanded in part on other grounds,* 75 B.R. 402 (D. Utah 1987). In *Roberts*, the bankruptcy court stated:

> To "hold an interest adverse to the estate" means (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

46 B.R. at 827. And the court defined representing an adverse interest as "serv[ing] as [an] agent or attorney for any individual or entity holding such an adverse interest." *Id. See Dye v. Brown (In re AFI Holding, Inc.)*, 530 F.3d 832, 845 (9th Cir. 2008) (adopting language similar to *Roberts* in the context of removing the trustee); *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005) (same); *Kravit, Gass & Weber, S.C. (In re Crivello)*, 134 F.3d 831, 835 (7th Cir. 1998) (same); *Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 361 (11th Cir. 1994) (same); *Rome v. Braunstein*, 19 F.3d 54, 57 n.1

14

(1st Cir. 1994) (same); *In re Caldor Inc.–NY*, 193 B.R. 165, 171 (Bankr. S.D.N.Y. 1996) (same).

Courts recognize that the determination whether an attorney has an interest that is adverse to the estate is "largely driven by the facts." *In re Leslie Fay Cos.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994). In *Leslie Fay*, the court concluded that "if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate." *Leslie Fay*, 175 B.R. at 533.

And the Second Circuit noted that ascertaining the meaning of "disinterested" requires a separate analysis. *See AroChem*, 176 F.3d at 628 (observing that "it is not enough" for counsel to satisfy the requirements of Bankruptcy Code Section 327(a), counsel also must be "disinterested"). As the *Leslie Fay* court stated, "[t]he word 'disinterested' is a term of art . . . ." *Leslie Fay*, 175 B.R. at 531-32. Whether an interest is adverse to an estate is determined on a case-by-case basis. "[M]ost courts eschew a *per se* rule in favor of analysis premised upon the totality of the circumstances in a particular case." *Caldor*, 193 B.R. at 172.

The disinterestedness requirement is founded upon important policy considerations which "'serve [to] ensur[e] that all professionals appointed pursuant to [Section 327] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'" *In re Project Orange Assocs., LLC*, 431 B.R. 363, 371 (Bankr. S.D.N.Y. 2010) (quoting *Leslie Fay*, 175 B.R. at 532). For these reasons, the standard for disinterestedness is high. But it is also specific, and facts, not impressions, are required.

### *Whether Troutman Is Disinterested*

Here, the record shows that the Trustee has already demonstrated that, subject to Mr.

15

Klein's objection as to claims that the Trustee may assert against Mr. Klein or GRV, he may

retain Troutman as his general and bankruptcy counsel for the estate.  That is, subject to that

objection, the Court has already determined that Troutman represents no interest adverse to the

Debtor's estate with respect to the matters upon which the firm is to be engaged and is

disinterested as that term is defined in Bankruptcy Code Section 101(14), and an order has been

entered to that effect.  The Court has also already determined that Troutman's employment is

necessary and would be in the best interests of the Debtor's estate.

Accordingly, based on the entire record, the Court concludes that subject to Mr. Klein's

objection, the Trustee has shown that Troutman is disinterested within the meaning of

Bankruptcy Code Section 327.

## *The Standards Governing Disqualification*

The decision to disqualify an attorney is committed to the sound discretion of the court.

*Allegaert v. Perot*, 565 F.2d 246, 248 (2d Cir. 1977).  As the Second Circuit has observed, "'a

client's right freely to choose his counsel'" must be balanced "against 'the need to maintain the

highest standards of the profession.'"  *Hempstead Video, Inc. v. Vill. of Valley Stream*, 409 F.3d

127, 132 (2d Cir. 2005) (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir.

1978)).  This relief is rare, because disqualification interferes with the attorney-client

relationship and is at odds with a client's right to select counsel of his or her own choosing.  *GSI*

*Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010).  But courts

should not hesitate to take this step when necessary.

Courts scrutinize motions to disqualify an adversary's counsel with special care because

of the obvious potential for abuse.  *Allegaert*, 565 F.2d at 251.  Disqualification may be

16

necessary where an attorney's conflict of interest erodes the court's confidence in his or her ability to represent the client and "where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation." *Bd. of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).

New York's professional conduct rules provide a framework to assess questions of conflicts of interest for bankruptcy courts sitting in this jurisdiction. At the same time, the Second Circuit has noted that while "state disciplinary codes provide valuable guidance, a violation of those rules may not warrant disqualification," which is disfavored unless "'an attorney's conduct tends to taint the underlying trial.'" *GSI Commerce Solutions*, 618 F.3d at 209 (quoting *Nyquist*, 590 F.2d at 1246).

It is fundamental that a lawyer may not represent an interest that is adverse to that of a current client. As the Second Circuit has found, "[w]here the relationship is a continuing one, adverse representation is prima facie improper . . . ." *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976). It is equally fundamental that a lawyer may not represent an interest that is adverse to a former client in a substantially related matter. As the Second Circuit similarly observed, "[t]he 'substantial relationship' test is . . . the one that we have customarily applied in determining whether a lawyer may accept employment against a former client." *Cinema 5*, 528 F.2d at 1386. *See Hempstead Video, Inc.*, 409 F.3d at 133 (stating that "[i]n cases of successive representation . . . an attorney may be disqualified from representing an interest adverse to a former client where the matters are substantially related and the attorney was likely to have had access to confidential information).

Courts in this Circuit applying New York law use a three-part test when a former client

seeks to disqualify its opponent's lawyer.  The movant must show:

> (1)      the moving party is a former client of the adverse party's counsel;
>
> (2)      there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3)      the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video*, 409 F.3d at 133 (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d

Cir. 1983)).

The party seeking the attorney's disqualification bears the burden of satisfying each part

of this test.  *See Evans*, 715 F.2d at 794 (observing that "the moving defendants bear the heavy

burden of proving facts required for disqualification.") (citing *Gov't of India*, 569 F.2d at 739 ).

Courts in the Second Circuit apply the "substantially related" element strictly, "requiring the

moving party to demonstrate that the relationship between the two actions is 'patently clear,' or

that the actions are 'identical' or 'essentially the same.'"  *Bennett Silvershein Assocs. v. Furman*,

776 F. Supp. 800, 803 (S.D.N.Y. 1991) (quoting *Gov't of India*, 569 F.2d at 740).

*Whether GRV or Mr. Klein Was an Actual or Prospective Client of Troutman*

The first step in the Court's inquiry is to determine whether GRV or Mr. Klein was an

actual or prospective client of Troutman.  New York's professional conduct rules provide useful

guidance on when the duties associated with an actual or prospective attorney-client relationship

arise.  New York Rule of Professional Conduct 1.18 defines a prospective client as "[a] person

who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect

to a matter . . . ."  N.Y.R. Prof'l Conduct 1.18(a) (2011).  Regardless of whether an attorney-

client relationship is formed, the lawyer may not "use or reveal information learned in the

consultation," N.Y.R. Prof'l Conduct 1-18(b) (2011), except as he or she would be permitted to do in the case of a former client, "regardless of how brief the initial conference may be," N.Y.R. Prof'l Conduct 1.18 cmt. 3 (2011).

The Restatement of the Law Governing Lawyers describes the framework for determining whether an attorney-client relationship has been formed.  Looking to the Restatement, one court found that "[a]n attorney-client relationship arises when the client manifests 'intent that the lawyer provide legal services for the [entity]' and the lawyer 'manifests consent to do so' or fails to 'manifest lack of consent.'"  *Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 392 B.R. 561, 588 (Bankr. D. Del. 2008) (quoting Restatement (Third) of the Law Governing Lawyers § 14 (2000)).

The Restatement provides further that "[t]he client's intent may be manifest from surrounding facts and circumstances . . . . No written contract is required."  Restatement (Third) of the Law Governing Lawyers § 14 cmt. c (2000).  When the client is an entity, whether the representation is limited to the organization or also extends to individuals related to the entity "is a question of fact to be determined based on reasonable expectations in the circumstances."  *Teleglobe Commc'ns*, 329 B.R. at 588 (quotation omitted).

Courts consider many factors in determining whether a client's belief that a lawyer represents him or her is reasonable, including the client's subjective belief as to the representation.  In one situation, the court found that the plaintiff's subjective belief that a law firm represented him was unreasonable where there was no retainer agreement in effect and more than eight years had passed since the attorney represented the plaintiff "in a legal capacity."  *DeVittorio v. Hall*, 2007 WL 4372872, at *7-8. (S.D.N.Y. Dec. 12, 2007).  And

19

while a court may consider a putative client's subjective belief that an attorney-client relationship exists, that belief alone "is not sufficient to establish an attorney-client relationship." *Kubin v. Miller*, 801 F. Supp. 1101, 1115 (S.D.N.Y. 1992). In order to determine whether such a relationship exists, "'it is necessary to look at the words and actions of the parties.'" *Hashemi v. Shack*, 609 F. Supp. 391, 393 (S.D.N.Y. 1984) (quoting *People v. Ellis*, 91 Misc. 2d 28, 35, 397 N.Y.S.2d 541, 545 (Sup. Ct. N.Y. Co. 1997)).

The Trustee and Mr. Klein agree that GRV was a client of Troutman in connection with the China Project. But they do not agree as to whether Mr. Klein was ever a client of the firm. Mr. Klein argues that as a result of GRV's continuing relationship with Troutman and his own role as GRV's sole shareholder, he was also a Troutman client in his individual capacity. Mr. Klein also argues that Troutman led him and GRV to believe that the firm represented both of them in connection with the China Project. The Trustee disagrees, and states that Troutman represented only GRV and owes duties only to that entity.

Mr. Klein and his brother Hershel Klein approached Troutman in July 2008 to inquire about representation in connection with the China Project. Hershel Klein testified that he made the initial contact, and explained to Ms. Cassirer "what we are looking for the law firm to provide to us." 9/20/11 Tr. 28:4-5. He also advised Ms. Cassirer via e-mail that he was "extremely conscious about keeping the information that [he] would be giving her confidential." 9/20/11 Tr. 21:19-20. He testified that Troutman sent "us" a draft letter of intent using the name of an investment vehicle that he provided, before "we changed" the investment vehicle for the China Project to GRV. 9/20/11 Tr. 43:4, 21-22.

Mr. Klein testified that in the first week of August 2008, he, Hershel Klein, Ms. Cassirer

and Mr. Epstein communicated both orally and by e-mail about the structure of the China Project and how it might be funded. He advised Troutman that it was "important . . . for the project itself . . . to be confidential," and that "we" were going to provide "confidential information . . . in connection with . . . this particular project in China." 9/21/11 Tr. 23:3-4, 25:13, 18-19. Mr. Klein understood that all of the information provided to Troutman would be kept confidential.

Mr. Klein argues that because GRV was not discussed in these early conversations, Troutman could not reasonably have believed that GRV was its client. Mr. Klein also argues that despite the later discussions about the use of an entity as the China Project investment vehicle, he reasonably believed that he, individually, was Troutman's client.

Here, as noted above, the parties agree that GRV was an actual client of Troutman. The record also establishes that Mr. Klein was a prospective client of the firm with respect to the China Project. In the course of the preliminary discussions about the China Project among Mr. Klein, Hershel Klein, and Troutman, Mr. Klein may be viewed as "[a] person who discusses with a lawyer the possibility of forming a client-lawyer relationship" with respect to that matter. N.Y.R. Prof'l Conduct 1.18(a) (2011).

Accordingly, based on the entire record, the Court concludes that GRV was an actual client of Troutman, and Mr. Klein was a prospective client of Troutman, with respect to the China Project.

_Whether GRV Was a Current Client of Troutman when the Trustee Sought To Retain the Firm_

The next step in the Court's inquiry is whether GRV, which retained Troutman in connection with the China Project, remained a client of the firm at the time that the Trustee sought to retain it in this bankruptcy case. New York Rule of Professional Conduct 1.7 governs

conflicts of interest involving current clients.  This rule prohibits a lawyer from "representing a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests . . . ."  N.Y.R. Prof'l Conduct 1.7(a) (2011).

The rules do not describe a single standard to determine when an attorney-client relationship exists, and the realities of law practice suggest that a common-sense approach based on the particular facts and circumstances is warranted.  Indicia of an ongoing attorney-client relationship may include regular communications relating to the subject matter of the representation as well as activity by the attorney and the client in furtherance of the objective of the retention.  A current attorney-client relationship may also be reflected in the attorney's time and billing records.

Mr. Klein argues that an attorney-client relationship between GRV and Troutman continued through July 2011, when the Trustee proposed to retain the firm as his counsel.  He asserts that if Troutman believed that its representation of GRV concluded at the end of 2008, then it should have said so at the time that it issued its retention letter and bill.  The Trustee disagrees, and argues that Troutman's representation of GRV in connection with the China Project concluded in late December 2008, when the project was put on hold and the firm closed the file.

The record shows that GRV retained Troutman as its counsel in connection with the China Project in 2008.  Troutman provided services to GRV over the course of several months from August to December 2008, and submitted invoices for its services through November 2008 and again through December 2008.  Troutman also provided Mr. Klein with an engagement letter reflecting the engagement of the firm by GRV in connection with the China Project in

November 2008 and again in December 2008, and Hershel Klein executed the engagement letter on behalf of GRV on December 29, 2008.

In late December 2008, Mr. Klein received an e-mail from the sponsor of the China Project indicating that the project was "on hold" because of the "global economic downturn." 9/21/11 Tr. 37:6; 10/28/11 Tr. 77:22-24.  The record does not indicate that there was any further activity among Troutman, GRV, Mr. Klein, and Hershel Klein in furtherance of the China Project in 2009 or thereafter.  In accordance with Troutman's practice, the file was closed after it had been inactive for one year.

Despite this lack of activity in 2009 and 2010, as the China Project remained dormant, "waiting for a global turnaround," Mr. Klein testified that he considered the Troutman representation of him to be continuing.  10/28/11 Tr. 78:6-7.  Mr. Klein further testified that he held the view that he remained a client of the firm until some time in 2011, when he received a communication from the firm saying that they were not his counsel.  In Mr. Klein's view, the China Project remains ongoing, and both he and GRV are current Troutman clients.

Here, the record shows that from late December 2008, the China Project was, at the very most, "on hold."  The record does not indicate that Troutman and GRV had communications about the China Project, or that Troutman and GRV undertook any activity in furtherance of it. And Troutman did not record or bill time to the matter.  Rather, in accordance with the firm's practice, the file was closed after it had been inactive for a year.  While it is unlikely that a client's activity, in isolation from counsel, could unilaterally prolong an attorney-client relationship, the record similarly does not indicate that GRV actively pursued the China Project during this period.

23

Accordingly, based on the entire record, the Court concludes that GRV was not a current client of Troutman at the time that the Trustee sought to retain the firm.

*Whether There Is a Substantial Relationship Between the Subject Matter of the Prior Representation and the Issues in the Present Retention*

The third step in the Court's inquiry is whether there is a substantial relationship between the subject matter of Troutman's prior representation of GRV and potential representation of Mr. Klein, on the one hand, and the issues in this bankruptcy case, on the other.  As noted above, in order for two matters to be substantially related, it must be shown that "the relationship between the two actions is 'patently clear,' or . . . the actions are 'identical' or 'essentially the same.'" *Bennett Silvershein Assocs.*, 776 F. Supp. at 803 (quoting *Gov't of India*, 569 F.2d at 740).

The interests protected by this rule include the interest of a client or prospective client in the attorney's undivided loyalty and the preservation of any confidential information that was shared during the relationship.  As New York Rule of Professional Conduct 1.9 states, a lawyer generally may not "use confidential information of the former client . . . to the disadvantage of the former client."  N.Y.R. Prof'l Conduct 1.9(c)(1) (2011).  The same rule applies to confidential information shared by a prospective client.  *See* N.Y.R. Prof'l Conduct 1.18 (2011) (attorney may not use confidential information shared by prospective client).  *See Bennett Silvershein Assocs.*, 776 F. Supp. at 804.

Courts in this Circuit presume "that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation." *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F. Supp. 265, 268 (S.D.N.Y. 1953).  The party objecting to an attorney's retention has the "burden of showing how this information [is] relevant to the present action."  *Petroquimica de Venezuela, S.A. v. M/T Trade Resolve (In re*

24

*Maritima Aragua, S.A.)*, 847 F. Supp. 1177, 1182 (S.D.N.Y. 1994).

One court described "substantially related" subject matter as follows:

[Subject matter] should be considered sufficiently related to a later case to warrant disqualification only to the degree that the information the client disclosed in that earlier consultation is useful in the later case. Information can be useful even if the two matters are not identical. However, the attorney must gain some advantage not otherwise available but for the prior confidential relationship, even if that advantage goes only to background matters.

*Bennett Silvershein Assocs.*, 776 F. Supp. at 804. That court further explained that the

"usefulness" of information communicated in the prior representation "can be ascertained by

comparing [it] with the allegations in the current dispute." *Id.*

Mr. Klein argues that there is a substantial relationship between the subject matter of

Troutman's prior representation and the issues in the present retention because Troutman gained

access to confidential information about his business and financial arrangements that the Trustee

may use to his advantage in this bankruptcy case. Mr. Klein asserts that "GRV will be harmed"

if the Trustee is allowed to retain Troutman in connection with claims the Trustee may assert

against Mr. Klein or GRV because, among other reasons, the Trustee may "use GRV's own

confidential information that it provided to [Troutman]." Klein Mem. 27, ECF No. 220.

The Trustee states that he and Troutman "evaluated all the alleged conflict of interest

issues raised by [Mr.] Klein," and disputes that there is a substantial relationship between the

subject matter of Troutman's prior representation and the issues here. Trustee Mem. n.1, ECF

No. 193.

It is plain from the record that the subject matter of Troutman's actual representation of

GRV and potential representation of Mr. Klein in 2008 was the China Project. As Mr. Klein

testified, after "we retained" Troutman, he spoke with Mr. Epstein and Mr. Wang in the firm's

Shanghai office about legal due diligence, contract negotiations, and business issues related to the matter.  11/14/11 Tr. 10:19-11:25.  Mr. Klein also consulted with Troutman's Shanghai attorneys about the structure of a corporate entity under Chinese law, the information required by Chinese law for a valid letter of intent, and methods to fund a company in compliance with Chinese law.

Mr. Klein testified that he anticipated using one of his entities to finance the China Project, and that he, Hershel Klein, and Mr. Epstein and Mr. Wang in Troutman's Shanghai office discussed possible funding vehicles in general terms.  According to Mr. Klein, they discussed "general information" about "different vehicles" for the investment, including Caring, in which Mr. Klein invested his personal funds, GRV, and another entity known as FlexoCraft.  11/14/11 Tr. 13:21-14:13, 25:7.  And Mr. Klein declared that he does not want Troutman to represent the Trustee because "[e]ssentially, I gave them a roadmap to everything about my finances specifically related to Caring," and he does not want the Trustee to "be able to use that information . . . to take away my rights . . . in Caring."  11/14/11 Tr. 28:1-5.

But Mr. Klein also acknowledged that he did not provide Troutman with written documentation about his personal assets, or those of Caring, GRV, or FlexoCraft, including tax returns, balance sheets, personal income or other financial statements, or bank statements, brokerage statements, or credit card statements.  And while Mr. Klein, Hershel Klein, Mr. Epstein, and Mr. Wang communicated frequently via e-mail, Mr. Klein stated that "much – a lot" of the communication among himself, Hershel Klein, and Troutman's Shanghai attorneys about possible funding sources was oral.  11/14/11 Tr. 22:20.

Here, as noted above, the China Project was the subject matter of Troutman's actual and

potential retention in 2008.  The record shows that the China Project, a real estate venture in

China, is not substantially related to claims that the Trustee may assert against Mr. Klein or

GRV.  That is, Mr. Klein has not established that there is a relationship between these matters

that is "'patently clear,' or . . . that the actions are 'identical' or 'essentially the same.'"  *Bennett*

*Silvershein Assocs.*, 776 F. Supp. at 803.

Nor has Mr. Klein shown that "information . . . disclosed in that earlier consultation is

useful in the later case."  *Bennett Silvershein Assocs.*, 776 F. Supp. at 804.  While he aims to

paint a different picture through his testimony and argument, Mr. Klein's statement that he

provided Troutman with a "roadmap to everything about my finances specifically related to

Caring" lacks credibility and is at odds with substantial and persuasive evidence to the contrary.

This evidence includes contemporaneous e-mails, documents, and testimony.  11/14/11 Tr. 28:1-

2.

Accordingly, based on the entire record, the Court concludes that there is not a

substantial relationship between the subject matter of Troutman's representation of GRV and

potential representation of Mr. Klein, and the issues in the present retention.

\*          \*          \*

For these reasons, and based on the entire record, the Court concludes that Mr. Klein has

not shown that Troutman should be disqualified from serving as general and bankruptcy counsel

for the Trustee on behalf of the Debtor's estate as to claims that the Trustee may assert against

him or GRV, and to that extent, Mr. Klein's objection is overruled.

*The Standards Governing Disclosure*

A trustee's application to retain a professional is subject to standards governing

disclosure, as set forth in Bankruptcy Rule 2014. Rule 2014 requires the trustee to state, among other things, why the employment is necessary, the name of the professional selected and the reasons for the nominee's selection, the services to be rendered, "and, to the best of the applicant's knowledge, all of the person's connections with . . . creditors, any other party in interest, [and] their respective attorneys and accountants. . . ." Fed. R. Bankr. P. 2014(a). And the trustee must submit along with his or her application a "verified statement" made by the professional seeking to be retained "setting forth the person's connections" to the debtor, creditors, and any other party in interest. *Id.* Disclosure requirements are construed strictly. *Leslie Fay*, 175 B.R. at 533. Facts that may bear on the disinterestedness of a professional must be disclosed, and the burden is on the professional, not the court, to assure that "all relevant connections have been brought to light." *Id.*

As one court observed, "the obligation to disclose is not a subjective one, whereby the professional discloses only those 'connections' that he/she/it concludes are relevant." *In re Matco Elecs. Group, Inc.*, 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008) (citing *FiberMark, Inc.*, 2006 WL 723495 at *8 (Bankr. D. Vt. Mar. 11, 2006)). *See In re WorldCom, Inc.*, 311 B.R. 151, 164 (Bankr. S.D.N.Y. 2004) (noting that the Bankruptcy Rule 2014 disclosure requirement is strictly construed and that the professional seeking to be retained must disclose all facts that bear on disinterestedness); *In re Mercury*, 280 B.R. 35, 56 (Bankr. S.D.N.Y. 2002), *aff'd,* 122 Fed. Appx. 528 (2d Cir. 2004) (same) (citing cases).

*Whether Troutman's Disclosures Under Bankruptcy Code Section 327 and Bankruptcy Rule 2014 Are Adequate*

Mr. Klein contends that the Trustee does not adequately disclose Troutman's interests in this matter, including interests that are adverse to the estate. The Trustee disagrees, and

contends that Troutman has complied with Bankruptcy Rule 2014 and does not hold an interest that is adverse to the estate. In particular, he argues that the disclosures made by Mr. Campo in his declarations adequately and accurately disclose that the firm does not represent an interest adverse to any creditor in this case.

Here, as the record reflects, Mr. Campo's first Bankruptcy Rule 2014 declaration does not disclose Troutman's prior representation of GRV or prospective representation of Mr. Klein. At the same time, the record also reflects that when these matters were brought to the Trustee's attention, the Trustee promptly filed a supplemental Bankruptcy Rule 2014 declaration of Mr. Campo that set forth that information.

Accordingly, based on the entire record, the Court concludes that taken as a whole, the disclosures made by the Trustee and Troutman are sufficient to satisfy the requirements established by Bankruptcy Rule 2014. The Court also finds that the timing and circumstances of these disclosures do not provide a basis to dislodge the Trustee's choice of counsel or to invoke the harsh remedy of disqualification.

For these reasons, and based on the entire record, the Court concludes that Mr. Klein has not shown that Troutman should be disabled from serving as general and bankruptcy counsel for the Trustee on behalf of the Debtor's estate as to claims that the Trustee may assert against Mr. Klein or GRV, and to that extent, Mr. Klein's objection is overruled.

Conclusion

This Court has already determined that the Trustee may retain Troutman as his general and bankruptcy counsel on behalf of the Debtor's estate for all matters except as to claims that he may assert against Mr. Klein or GRV. For the reasons stated herein, and based on the entire

record, the Court now concludes that Mr. Klein's objection is overruled, and the Trustee may also retain Troutman as to claims that he may assert against Mr. Klein or GRV. The Court has considered all of the other arguments advanced by Mr. Klein and concludes that they are without merit. The Court will issue an order in conformity with this Memorandum Decision.

Dated:  Brooklyn, New York
        March 5, 2012

                                        _s/ Elizabeth S. Stong_____
                                        HONORABLE ELIZABETH S. STONG
                                        UNITED STATES BANKRUPTCY JUDGE